# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| KENDALL BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13-cv-5109 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| OFFICER ERICK HOWARD (Star No. 5340), | ) | |
| SERGEANT ROBERT GOODE (Star No. 2242), | ) | |
| OFFICER SHERITA LEWIS, and the | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' joint motion for summary judgment [39]. For the reasons set forth herein, Defendants' motion is granted.

**I.     Background**

The Court takes the relevant facts from the parties' Local Rule 56.1 statements, construing the facts in the light most favorable to the nonmoving party (here, Plaintiff).[1]

**A.     The Incident**

On April 2, 2013, Plaintiff Kendall Brown was arrested for stealing non-party Falaah Shabazz's wallet from his 2009 maroon Jaguar XF while Mr. Shabazz was getting his car washed. The car wash in question—located on the 7200 block of Stoney Island Avenue in Chicago, Illinois—is an indoor "hand car wash" facility, where a customer selects his desired

---

[1] Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. The rule permits a movant to file up to 80 separately-numbered statements of undisputed facts. L.R. 56.1(a)(3). The rule also requires the nonmovant to file a concise response to the movant's statement of facts setting forth "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials." L.R. 56.1(b)(3)(A).

cleaning service and then relinquishes his vehicle to the car wash employees who escort the vehicle through a series of detailing stations (*e.g.*, exterior washing, interior vacuuming, wheel polishing, etc.), depending on the services requested. Customers can watch their vehicles wending through the car wash from a waiting room with windows that face out into the main garage area.

On the day in question, Plaintiff—who, at that time, had been working at the car wash for about one month—greeted Mr. Shabazz, took his order and his keys, gave him a ticket, pulled his car forward and sprayed it down with water to begin the washing process. After this brief exchange, Mr. Shabazz went into the waiting room where he eventually approached the cashier, Michele Davis, to pay for his car wash. It was then that he realized that his wallet was missing. He searched his pockets and his car to no avail, and then told Ms. Davis that he was going to call his wife to see if he left his wallet at home. Shortly thereafter Mr. Shabazz became convinced that his wallet was stolen, and he began questioning the car wash employees and threatening to search through their pockets to find his wallet (and at one point he accused one of the "Mexican workers" of stealing his wallet (Plaintiff is African–American)). Around this time, Plaintiff emerged from the bathroom and was drawn to the commotion stemming from Mr. Shabazz's questioning of his co-workers. Plaintiff told Mr. Shabazz that he could not go through his pockets, and that he would need to call the police if something was missing.

Shortly thereafter Mr. Shabazz's wife—Defendant Sharita Lewis, a plain-clothes Chicago police officer who was off duty at the time—arrived and took control of the investigation. Mr. Shabazz explained to Officer Lewis that he thought that a car wash employee stole his wallet, but he did not suggest any potential suspects, and he explained that his car was in the "soap-up" phase when he realized that his wallet was missing and that multiple employees would

have had access to his vehicle by that time. Officer Lewis shut down operations, brought all of the employees into a single area for questioning, and called for backup. Put off by Officer Lewis's intent to shut down the car wash, Ms. Davis (the cashier) called 9-1-1 and requested that a supervising officer be sent to monitor the situation. At some point thereafter, Officer Howard and Sergeant Goode (both named Defendants) arrived on the scene, along with additional members of the "tact team." The total number of officers and the order in which they arrived is unclear. Upon arrival, Officer Howard and Sergeant Goode were informed that Mr. Shabazz believed that his brown wallet had been stolen from his Jaguar by a car wash employee.

As the investigation continued, Ms. Davis (the cashier) volunteered to assist the officers by searching each employee—including Plaintiff—in the officers' presence, while the officers continued their questioning. While Plaintiff was being searched, Officer Lewis asked Plaintiff if he "was the smart one," referencing his comment to Mr. Shabazz earlier that he refused to submit to a search until the police arrived. Mr. Shabazz testified that Plaintiff was "the one talking loudest that nobody [was] going to search him and he wasn't a thief and [they] better not put their hands in his pockets." There is a factual dispute over what Plaintiff told the police about his interactions with Mr. Shabazz's car: the officers say that Plaintiff told them that he never entered the car, but Plaintiff denies this assertion, claiming that he was honest in reporting that he was the one who took Mr. Shabazz's keys and pulled the car up. Regardless, after searching the car wash and questioning and searching the employees,[2] the officers were unable to locate the wallet; the only object found on Plaintiff was his cell phone. No arrests were made at that time.

B.  **The Surveillance Video**

As the investigation was winding down, the car wash manager (referred to only as "Dan" or "Danny") arrived; Ms. Davis had called him to let him know what was going on. Danny

---

[2] Plaintiff testified that the search lasted for 45 minutes. [41-3, at 30.]

informed the officers that the car wash was equipped with surveillance cameras,[3] and he invited the officers into the video room to review the footage. There are some disputes as to who accompanied Danny to the video room to watch the footage, but at a minimum, the room included Danny, Sergeant Goode, and Officer Howard (Mr. Shabazz, Ms. Davis, and Officer Lewis also testified in their depositions that they were in the room). Their accounts of what they saw in the video vary to some degree:

> Mr. Shabazz testified that Plaintiff reached into the car through the open driver's-side door with an empty hand, retrieved an object, and placed the object in his pocket. He admits that the object was not identifiable, claiming, "I don't know if he just found a quarter, I don't know what it was, but at that particular time we knew he found something in my car that he felt like he wanted to put in his pocket." [41-3, at 67.]

> Sgt. Goode testified that when he entered the video surveillance room, the manager had the video queued up to the relevant clip, wherein Sgt. Goode witnessed Plaintiff open the driver's-side door of Mr. Shabazz's car, reach into the vehicle, remove an object from the driver's-side door, and place the object into his back pocket. The sergeant testified that he "couldn't distinguish what [the object] looked like," and couldn't describe anything about it. [41-2, at 17.]

> Officer Howard testified that the video showed Plaintiff in Mr. Shabazz's car (he couldn't recall if Plaintiff's whole body was in the car or not), and approximately one minute later Plaintiff came out of the car with a black object in his hand. [41-2, at 37.]

> Officer Lewis testified that Plaintiff went into the car (she can't remember if he sat down), took something out of the console, and put it in his pocket. [41-2, at 62–63.]

> Car wash employee Michele Davis recalls seeing Plaintiff sitting in the car with the driver's-side door open when he pulled something out of his pocket, looked at it, and put it back into his pocket. She didn't say anything to the officers about her impression of the video (although at her deposition she said that she thought it was his cell phone), and she testified that after watching the video, "we assume[d] that [Plaintiff] took the wallet." After reviewing the footage, Ms. Davis

---

[3] Plaintiff testified that he "did not even really know there were surveillance cameras," claiming that "[p]eople said there w[ere cameras], but you would never see them." [41-3, at 30.]

approached Plaintiff and said "it was you, come on out." She claims that Plaintiff asked her to call his mother, and she refused the request, saying that she didn't want to get involved. Ms. Davis didn't have any other conversations with Plaintiff at the car wash that day.[4] [41-2, at 88–90.]

The car wash manager, Danny, was not deposed, and thus the Court has no first-had account of what he saw. The parties agree that while watching the surveillance video, Danny identified the man in the video as Plaintiff Kendall Brown.

While these accounts vary as to certain details (*e.g.*, whether Plaintiff was fully or partially in the vehicle, the precise locations within the vehicle Plaintiff may have touched, etc.), there is no factual dispute regarding two core observations, which are that the surveillance footage showed Plaintiff (a) enter (at least in part) Mr. Shabazz's vehicle, and (b) subsequently place a small, unidentified object into his pocket. [43, ¶¶ 16–17.]

The police requested a copy of the video footage, but Danny said that he didn't know how to make a copy. The video footage did not survive.

### C. The Arrest and Subsequent Legal Proceedings

After viewing the video footage,[5] Officer Howard and Sergeant Goode made the decision to place Plaintiff under arrest for the theft of Mr. Shabazz's wallet. Mr. Shabazz confirmed that he wanted the police to arrest Plaintiff, and he signed a criminal complaint for alleged theft. The State of Illinois prosecuted Plaintiff for theft, but the complaining witness (Mr. Shabazz) did not appear in court and the case was dismissed with leave to reinstate. [41-3, ex. 8.]

---

[4] Plaintiff testified that both Ms. Davis and Danny approached Plaintiff after watching the video to tell him "[t]hey ain't got you doing nothing on the tape," and "[t]hey ain't got you on that camera doing nothing," respectively. [41-3, at 30–31.] But Ms. Davis offered contrary testimony (testifying instead that she told Plaintiff "it was you, come on out"), and Danny was not deposed. These statements are inadmissible hearsay, and cannot form the basis of a disputed issue of material fact. See *Winskunas v. Birnbaum*, 23 F.3d 1264, 1268 (7th Cir. 1994); *De v. City of Chicago*, 912 F. Supp. 2d 709, 714 (N.D. Ill. 2012) ("Hearsay is just as inadmissible at summary judgment as it is at trial." (citing *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997))). Plaintiff's hearsay statements as presented in his Rule 56.1 statement [see 54, ¶¶ 18–19] will not be considered for purposes of this opinion.

[5] Plaintiff testified that the officers were in the video room for "20 or 25 minutes." [41-3, at 30.]

Plaintiff subsequently brought this civil action in federal court alleging a violation of his constitutional rights by arresting him without probable cause in violation of 42 U.S.C. § 1983 (Count I, against Defendants Howard, Goode, and Lewis), and a claim of malicious prosecution pursuant to Illinois state law (Count II, against all Defendants). [See Second Am. Compl., 26.] Defendants now seek summary judgment on both counts [39].

## II. Legal Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Sallenger v. City of Springfield, Ill.*, 630 F. 3d 499, 503 (7th Cir. 2010) (citing Fed. R. Civ. P. 56(c)(2) and noting that summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law"). In determining whether summary judgment is appropriate, the court should construe all facts and reasonable inferences in the light most favorable to the non-moving party. See *Carter v. City of Milwaukee*, 743 F. 3d 540, 543 (7th Cir. 2014). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Put another way, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

To avoid summary judgment, the opposing party then must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this

reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Koszola v. Bd. of Educ. of City of Chi.*, 385 F. 3d 1104, 1111 (7th Cir. 2004). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III. Analysis

### A. Probable Cause

Plaintiff alleges that Defendants violated his Fourth Amendment rights by arresting him without probable cause. Probable cause exists if "law enforcement agents * * * reasonably believe, in light of the facts and circumstances within their knowledge at the time of arrest, that the suspect had committed or was committing an offense." *United States v. Hayes*, 236 F.3d 891, 894 (7th Cir. 2001). Probable cause "is a fluid concept that relies on the common-sense judgment of the officers" at the time of arrest; it "is not a post hoc determination." *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006). Whether probable cause exists "is necessarily based on probabilities, and does not require 'evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime.'" *United States v. Carrillo*, 269 F.3d 761, 766 (7th Cir. 2001) (quoting *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001)) (citing *United States v. Faison*, 195 F.3d 890, 893 (7th Cir. 1999))). "In determining whether suspicious circumstances rise to the level of probable cause, law enforcement officers are entitled to draw reasonable inferences based on their own training and experience." *Carrillo*, 269 F.3d at 766 (citing *Faison*, 195 F.3d at 893).

Here—in an effort that lasted over an hour—the police (with the assistance of Ms. Davis, the cashier) questioned the car wash staff, searched them, and searched the car wash itself, but

7

made no arrests. Importantly, it wasn't until after the officers watched the surveillance video that they arrested Plaintiff, highlighting the importance of that video in establishing probable cause. Accordingly, the relevant, undisputed facts upon which the officers based their arrest are that (1) Mr. Shabazz told police that he believed his wallet was stolen from his car at the car wash, and (2) the car wash's video surveillance footage showed Plaintiff enter (or reach into) Mr. Shabazz's car and subsequently put a small, unidentified object into his pocket.[6] The question is whether these facts establish probable cause for arrest.[7]

One reasonable possibility is that the officers deemed Mr. Shabazz to be credible when claiming that his wallet was stolen from his car at the car wash, and upon viewing the surveillance video, determined that Plaintiff's act of entering Plaintiff's car and putting an object into his pocket was suspicious enough to warrant arrest, despite the fact that no one ever saw Plaintiff with the wallet. However, in assessing whether police had probable cause to arrest, "it is common and helpful for courts to consider possible innocent alternatives that might explain the facts before the agents," although "the mere existence of innocent explanations does not necessarily negate probable cause." *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003).

One innocent explanation is that Plaintiff placed some object other than Mr. Shabazz's wallet into his pocket (*e.g.*, as Plaintiff says, his cell phone). This explanation is buttressed by the fact that a search of Plaintiff revealed a cell phone but no wallet, and those objects are of similar shape and size, meaning that the officers could have confused one for the other. That being said,

---

[6] As detailed in the background section, there are conflicting accounts as to what the surveillance video showed. But it is undisputed that the video showed Plaintiff enter (at least in part) Mr. Shabazz's car and subsequently place a small object into his pocket.

[7] Defendants also claim that their arrest of Plaintiff was based in part on the fact that Plaintiff told the police that he never entered Mr. Shabazz's vehicle, but the videotape showed otherwise, allowing the police to infer that Plaintiff's lie was an effort to cover up his theft of the wallet. Lies such as this can contribute to a showing of probable cause. See, *e.g.*, *Reed*, 443 F.3d at 603–04. But there is a factual dispute surrounding whether Plaintiff actually denied entering the vehicle, and thus the Court cannot consider this testimony in assessing whether probable cause existed.

other undisputed facts indicate that the search of Plaintiff—conducted by a fellow car wash employee—was not a strong indicator of whether he may have taken the wallet, including the not-insignificant gap in time between the alleged theft and the search of Plaintiff, during which Plaintiff's whereabouts were not fully accounted for, including a period of time that Plaintiff spent in the bathroom. And while it's possible that Plaintiff had a reason to put his cell phone in his pocket while in Mr. Shabazz's car (*e.g.*, it fell out of his pocket, he was reading a text message, etc.), there is also reason to credit the observation skills of trained and experienced police officers in distinguishing innocent cell phone usage from the theft of a wallet.

Another innocent explanation is that Mr. Shabazz lost his wallet somewhere else. The facts are thin in this area, but there is some indication that Mr. Shabazz originally considered the possibility that he left his wallet at home. How exactly he resolved this issue and how he determined that his wallet was stolen at the car wash are unknown. However, the key fact is what the officers knew at the time, and Plaintiff admits that "Lewis, Goode and Howard were informed that Shabazz believed his brown wallet had been stolen from his vehicle." [43, at 3.]

A third innocent explanation is that someone else at the car wash took Mr. Shabazz's wallet. It is undisputed that multiple car wash employees entered Mr. Shabazz's vehicle, and at one point Mr. Shabazz accused a Hispanic car wash employee of stealing his wallet (Plaintiff is African–American). However, the police treated all car wash employees as equal suspects, and all employees were questioned and searched. That being said, the officers testified that the car wash manager, Danny, queued up the video to the incriminating clip, and there is no indication that the officers watched all available video footage. This fact cuts in favor of both parties: In Plaintiff's favor, this means that the police may not have reviewed the portions of the video depicting the other car wash employees who entered Mr. Shabazz's car (and there is no evidence

9

that the video camera even captured the actions of all such persons, highlighting a potential hole in the investigation). But in Defendants' favor, this shows that (a) the store manager made an independent determination that the clip involving Plaintiff was the relevant clip to review, and (b) upon reviewing the clip, the officers were convinced that Plaintiff took the wallet, and thus did not need to continue their investigation further. Again, the potential innocent explanation is balanced by an equally reasonable incriminating explanation.

In assessing whether an officer had probable cause for an arrest, a court must also consider the officer's actions in light of the criminal statute that the arrestee purportedly violated. See *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 761 (7th Cir. 2006). Here, Defendants arrested Plaintiff for theft under 720 ILCS 5/16-1(a)(1)(A) of the Illinois Criminal Code. Under that statute, a theft occurs when an individual knowingly "[o]btains or exerts unauthorized control over property of the owner" * * * and "[i]ntends to deprive the owner permanently of the use or benefit of the property." 720 ILCS 5/16-1(a)(1), (a)(5)(A); see also *Hawkins v. Mitchell*, 756 F.3d 983, 995 (7th Cir. 2014). Plaintiff argues that the undisputed facts do not establish that he ever had control over the wallet, and that absent possession, there is no theft. While this is technically true, that argument speaks to Plaintiff's criminal liability (or lack thereof) and ignores the applicable standard here, which is whether the arresting officers had probable cause to believe that Plaintiff violated the Illinois theft statute. The officers witnessed Plaintiff enter Mr. Shabazz's vehicle and subsequently place a small object into his pocket. These facts align well with the *prima facie* requirements of an Illinois theft violation, and because the Court's only concern is whether these facts are sufficient to establish probable cause for arrest, the fact that the officers never saw Plaintiff with the wallet is inconsequential.

In summation, while there are a number of disputed issues here, the core facts (*i.e.*, that Plaintiff entered Mr. Shabazz's car and put a small object into his pocket) are undisputed. And while there are innocent explanations for Plaintiff's conduct (*e.g.*, that the object in question was his cell phone), the officers' inference that Plaintiff took the wallet is at least as probable as any innocent inference. See *Funches*, 327 F.3d at 587. Based on the totality of the circumstances, when considered in light of the officers' training and experience, there was sufficient reason for the officers to believe that Plaintiff took the wallet. Thus, the Court finds that the officers had probable cause to arrest Plaintiff.

### B. Qualified Immunity

Defendants argue in the alternative that even if the officers did not have probable cause to arrest Plaintiff, the officers are nonetheless entitled to immunity from Plaintiff's § 1983 claim. "Police officers performing discretionary functions—such as determining whether they have probable cause to arrest—enjoy qualified immunity from suit unless it would have been clear to a reasonable police officer that, given the situation she confronted, her conduct violated a constitutional right." *Pourghoraisi*, 449 F.3d at 761 (citing *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)). In assessing the merits of a qualified immunity defense, the threshold question "is whether, given the facts taken in the light most favorable to the plaintiff, there is any merit to the underlying constitutional claim." *Id.* If so, the court then examines "whether the right was clearly established at the time of the alleged injury; that is, whether a reasonable officer would have known that his actions were unconstitutional." *Id.*

As to the threshold inquiry, Plaintiff's underlying constitutional claim is that Defendants violated his Fourth Amendment rights by arresting him without probable cause. The Court already determined that Defendants had probable cause to arrest Plaintiff, and thus Defendants are entitled to qualified immunity, without the need to address the second inquiry.

For the sake of argument, even if there were a question as to whether probable cause existed, Plaintiff must still establish that no reasonable officer could have concluded that Defendants had probable cause to arrest him. Plaintiff argues that it was clearly established at the time of his arrest that police officer must have probable cause in order to justify the arrest. But this is too broad a proposition. Plaintiff has to show that it would have been clear to a reasonable officer that it was unlawful to arrest Plaintiff for theft based on the given scenario. And even under Plaintiff's version of the events, it is undisputed that the officers saw Plaintiff enter Mr. Shabazz's car and place *something* (relatively close in size to a wallet) in his pocket. Plaintiff failed to provide any authority clearly establishing that these facts are insufficient to substantiate probable cause for theft. And in fact, quite the opposite is true, as there is ample precedent indicating that in grey areas where probable cause may be questionable, the benefit falls to the law enforcement agent. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and * * * in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be personally liable."); *Pourghoraisi*, 449 F.3d at 761 ("'[T]he doctrine of qualified immunity leaves 'ample room for mistaken judgments' by police officers.'" (quoting *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003))). Thus, in the alternative, Plaintiff's § 1983 claim is also barred by the doctrine of qualified immunity.

C. **Malicious Prosecution**

Defendants also seek summary judgment on Plaintiff's malicious prosecution claim, brought pursuant to Illinois state law. [See 26, ¶ 37.] In order to establish a claim of malicious prosecution under Illinois law, the plaintiff must show "'(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the

proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.'" *Johnson v. Saville*, 575 F.3d 656, 659 (7th Cir. 2009) (quoting *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996)). "The absence of any one of these elements bars a plaintiff from pursuing the claim." *Swick*, 662 N.E.2d at 1242. "It follows that the existence of probable cause is a 'complete defense' to a malicious prosecution suit." *Johnson*, 575 F.3d at 659 (citing *Cervantes v. Jones*, 188 F.3d 805, 810–11 (7th Cir. 1999)).

Here, the Court has already established that Defendants had probable cause to arrest Plaintiff. This acts as a complete defense to Plaintiff's malicious prosecution claim, and thus Defendants are entitled summary judgment on Count II of Plaintiff's second amended complaint. The Court need not address the remaining elements of Plaintiff's malicious prosecution claim.

## IV. Conclusion

For the foregoing reasons, Defendants' joint motion for summary judgment [39] is granted. Judgment will be entered in favor of Defendants on all claims.

Dated: April 27, 2015

_____
Robert M. Dow, Jr.
United States District Judge